UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

JERMAINE PATTEN,

                    Plaintiff,

v.

ERICA HUSS et al.,

                    Defendants.

_____/

Case No. 2:22-cv-162

Honorable Maarten Vermaat

## OPINION

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Plaintiff previously sought and was granted leave to proceed *in forma pauperis*. (ECF No. 5.) Pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure, Plaintiff consented to proceed in all matters in this action under the jurisdiction of a United States magistrate judge. (ECF No. 6.)

This case is presently before the Court for preliminary review under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), pursuant to 28 U.S.C. § 1915A(b) and 42 U.S.C. § 1997e(c). The Court is required to conduct this initial review prior to the service of the complaint. *See In re Prison Litigation Reform Act*, 105 F.3d 1131, 1131, 1134 (6th Cir. 1997); *McGore v. Wrigglesworth*, 114 F.3d 601, 604–05 (6th Cir. 1997). Service of the complaint on the named defendant(s) is of particular significance in defining a putative defendant's relationship to the proceedings.

"An individual or entity named as a defendant is not obliged to engage in litigation unless notified of the action, and brought under a court's authority, by formal process." *Murphy Bros. v.*

*Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 347 (1999). "Service of process, under longstanding tradition in our system of justice, is fundamental to any procedural imposition on a named defendant." *Id.* at 350. "[O]ne becomes a party officially, and is required to take action in that capacity, only upon service of a summons or other authority-asserting measure stating the time within which the party served must appear and defend." *Id.* (citations omitted). That is, "[u]nless a named defendant agrees to waive service, the summons continues to function as the *sine qua non* directing an individual or entity to participate in a civil action or forgo procedural or substantive rights." *Id.* at 351. Therefore, the PLRA, by requiring courts to review and even resolve a plaintiff's claims before service, creates a circumstance where there may only be one party to the proceeding—the plaintiff—at the district court level and on appeal. *See, e.g.*, *Conway v. Fayette Cnty. Gov't*, 212 F. App'x 418 (6th Cir. 2007) (stating that "[p]ursuant to 28 U.S.C. § 1915A, the district court screened the complaint and dismissed it without prejudice before service was made upon any of the defendants . . . [such that] . . . only [the plaintiff] [wa]s a party to this appeal").

Here, Plaintiff has consented to a United States magistrate judge conducting all proceedings in this case under 28 U.S.C. § 636(c). That statute provides that "[u]pon the consent of the parties, a full-time United States magistrate judge . . . may conduct any or all proceedings . . . and order the entry of judgment in the case . . . ." 28 U.S.C. § 636(c). Because the named Defendants have not yet been served, the undersigned concludes that they are not presently parties whose consent is required to permit the undersigned to conduct a preliminary review under the PLRA, in the same way that they are not parties who will be served with or given notice of this opinion. *See Neals v. Norwood*, 59 F.3d 530, 532 (5th Cir. 1995) ("The record does not contain a

consent from the defendants[; h]owever, because they had not been served, they were not parties to the action at the time the magistrate entered judgment.").[1]

In this action, Plaintiff complains that Defendant Huss was deliberately indifferent to a substantial risk of serious harm to Plaintiff from the COVID-19 virus during the fall of 2020 and Plaintiff complains that Defendants Carlson and James were deliberately indifferent to a substantial risk of serious harm to Plaintiff from the COVID-19 virus during the spring of 2021.

Under Rule 21 of the Federal Rules of Civil Procedure, the Court may at any time, with or without motion, add or drop a party for misjoinder or nonjoinder. Fed. R. Civ. P. 21. For the reasons set forth below, the Court will drop as misjoined Defendants Carlson and James, and dismiss Plaintiff's claims against them without prejudice.

With regard to Plaintiff's remaining claim against Defendant Huss, under the PLRA, the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these

---

[1] *But see Coleman v. Lab. & Indus. Rev. Comm'n of Wis.*, 860 F.3d 461, 471 (7th Cir. 2017) (concluding that, when determining which parties are required to consent to proceed before a United States magistrate judge under 28 U.S.C. § 636(c), "context matters" and the context the United States Supreme Court considered in *Murphy Bros.* was nothing like the context of a screening dismissal pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c)); *Williams v. King*, 875 F.3d 500, 503–04 (9th Cir. 2017) (relying on Black's Law Dictionary for the definition of "parties" and not addressing *Murphy Bros.*); *Burton v. Schamp*, 25 F.4th 198, 207 n.26 (3d Cir. 2022) (premising its discussion of "the term 'parties' solely in relation to its meaning in Section 636(c)(1), and . . . not tak[ing] an opinion on the meaning of 'parties' in other contexts").

standards, the Court will dismiss Plaintiff's complaint against Defendant Huss for failure to state a claim upon which relief may be granted.

## Discussion

### I.       Factual Allegations

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Earnest C. Brooks Correctional Facility, (LRF) in Muskegon Heights, Muskegon County, Michigan. The events about which he complains, however, occurred at the Marquette Branch Prison (MBP) in Marquette, Marquette County, Michigan. Plaintiff sues MBP Warden Erica Huss and MBP Registered Nurses Danielle Carlson and Brenda James.

Plaintiff alleges that he was housed in segregation at MBP during September of 2020. The MDOC began mass testing of prisoners for COVID-19 at that time. Plaintiff asked Defendant Huss "what is the plan for people who test[] positive for the covid virus." (Compl., ECF No. 1, PageID.5.) Huss responded that prisoners who test positive would, "per DOM," be transferred downstate. (*Id.*) Plaintiff did not know what a "DOM" was. Defendant Huss informed him that the current DOM was DOM-2020-30R4 and that Plaintiff could obtain a copy from the library. Plaintiff obtained a copy. Plaintiff states that the DOM section regarding quarantine and care of sick prisoners stated: "prisoners who test positive will be transferred to one of the departments designated Quarantine unites at either G. robert cotton correctional facility, carson city correctional facility or the former maxey annex near woodland correctional facility." (*Id.* (capitalization in original retained).)

Plaintiff claims that two inmates, Hart and Carter, were placed in segregation. Plaintiff suggests, but does not state, that the prisoners had tested positive for the COVID-19 virus. Just a few days after the inmates were placed in segregation, Plaintiff started exhibiting COVID-19 symptoms.

4

When Plaintiff asked why COVID-19 positive inmates were placed in segregation, Huss responded that they were placed on the backside of the unit. Plaintiff replied that the whole unit shares the same ventilation system and that COVID-19 was an airborne virus.

Plaintiff suffered severe symptoms for a period of time. A few weeks later, he was released to general population.

Plaintiff filed a grievance regarding his exposure to the COVID-19 virus in segregation. He also filed grievances regarding inadequate care for a dislocated finger and for his high blood pressure. Plaintiff claims those grievances prompted Defendants Carlson and James to transfer him to segregation on April 8, 2021. They claimed that Plaintiff tested positive for COVID-19, but they did not provide any proof. Test results came back negative on April 12, but Plaintiff was not moved to a different unit until April 16.

Plaintiff contends that Defendant Huss violated the Eighth Amendment by exposing Plaintiff to a substantial risk of serious harm in segregation during the fall of 2020. Plaintiff contends that Defendants Carlson and James did the same thing during April of 2021 and that they exposed Plaintiff to that risk in retaliation for Plaintiff's filing of grievances regarding inadequate health care, in violation of the First Amendment.

Plaintiff asks the Court to award compensatory and punitive damages.

## II.    Misjoinder

Federal Rule of Civil Procedure 20(a) limits the joinder of parties in a single lawsuit, whereas Federal Rule of Civil Procedure 18(a) limits the joinder of claims. Rule 20(a)(2) governs when multiple defendants may be joined in one action:

> [p]ersons . . . may be joined in one action as defendants if: (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action.

5

Fed. R. Civ. P. 20(a)(2). Rule 18(a) states: "A party asserting a claim . . . may join, as independent or alternative claims, as many claims as it has against an opposing party." Fed. R. Civ. P. 18(a).

Courts have recognized that, where multiple parties are named, as in this case, the analysis under Rule 20 precedes that under Rule 18:

> Rule 20 deals solely with joinder of parties and becomes relevant only when there is more than one party on one or both sides of the action. It is not concerned with joinder of claims, which is governed by Rule 18. Therefore, in actions involving multiple defendants Rule 20 operates independently of Rule 18. . . .
>
> Despite the broad language of Rule 18(a), plaintiff may join multiple defendants in a single action only if plaintiff asserts at least one claim to relief against each of them that arises out of the same transaction or occurrence and presents questions of law or fact common to all.

7 Charles Allen Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1655 (3d ed. 2001), *quoted in Proctor v. Applegate*, 661 F. Supp. 2d 743, 778 (E.D. Mich. 2009), *and Garcia v. Munoz*, No. 08-1648, 2008 WL 2064476, at *3 (D.N.J. May 14, 2008); *see also United States v. Mississippi*, 380 U.S. 128, 142–43 (1965) (joinder of defendants is permitted by Rule 20 if both commonality and same transaction requirements are satisfied).

Therefore, "a civil plaintiff may not name more than one defendant in his original or amended complaint unless *one* claim against each additional defendant is transactionally related to the claim against the first defendant and involves a common question of law or fact." *Proctor*, 661 F. Supp. 2d at 778 (emphasis added) (internal quotation marks omitted). When determining if civil rights claims arise from the same transaction or occurrence, a court may consider a variety of factors, including, "the time period during which the alleged acts occurred; whether the acts . . . are related; whether more than one act . . . is alleged; whether the same supervisors were involved, and whether the defendants were at different geographical locations." *Id.* (quoting *Nali v. Mich. Dep't of Corr.*, No. 07-10831, 2007 WL 4465247, at *3 (E.D. Mich. Dec. 18, 2007)).

6

Permitting improper joinder of parties or claims in a prisoner civil rights action also undermines the purpose of the PLRA, which was to reduce the large number of frivolous prisoner lawsuits that were being filed in the federal courts. *See Riley v. Kurtz*, 361 F.3d 906, 917 (6th Cir. 2004).

The Seventh Circuit has explained that a prisoner like Plaintiff may not join in one complaint all of the defendants against whom he may have a claim, unless the prisoner satisfies the dual requirements of Rule 20(a)(2):

> Thus multiple claims against a single party are fine, but Claim A against Defendant 1 should not be joined with unrelated Claim B against Defendant 2. Unrelated claims against different defendants belong in different suits, not only to prevent the sort of morass that [a multi]-claim, [multi]-defendant suit produce[s] but also to ensure that prisoners pay the required filing fees—for the Prison Litigation Reform Act limits to 3 the number of frivolous suits or appeals that any prisoner may file without prepayment of the required fees. 28 U.S.C. § 1915(g) . . . .
>
> A buckshot complaint that would be rejected if filed by a free person—say, a suit complaining that A defrauded the plaintiff, B defamed him, C punched him, D failed to pay a debt, and E infringed his copyright, all in different transactions— should be rejected if filed by a prisoner.

*George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007); *see also Brown v. Blaine*, 185 F. App'x 166, 168–69 (3d Cir. 2006) (allowing an inmate to assert unrelated claims against new defendants based on actions taken after the filing of his original complaint would have defeated the purpose of the three-strikes provision of PLRA); *Patton v. Jefferson Corr. Ctr.*, 136 F.3d 458, 464 (5th Cir. 1998) (declining to allow "litigious prisoners to immunize frivolous lawsuits from the 'three strikes' barrier by the simple expedient of pleading unexhausted habeas claims as components of § 1983 suits"); *Shephard v. Edwards*, No. C2-01-563, 2001 WL 1681145, at *1 (S.D. Ohio Aug. 30, 2001) (declining to consolidate prisoner's unrelated various actions so as to allow him to pay one filing fee, because it "would improperly circumvent the express language and clear intent of the 'three strikes' provision"); *Scott v. Kelly*, 107 F. Supp. 2d 706, 711 (E.D. Va. 2000) (denying prisoner's

request to add new, unrelated claims to an ongoing civil rights action as an improper attempt to circumvent the PLRA's filing fee requirements and an attempt to escape the possibility of obtaining a "strike" under the "three strikes" rule).

Under these circumstances, to allow Plaintiff to proceed with improperly joined claims and Defendants in a single action would permit him to circumvent the PLRA's filing fee provisions. Courts are therefore obligated to reject misjoined complaints like Plaintiff's. *See Owens v. Hinsley*, 635 F.3d 950, 952 (7th Cir. 2011).

The analysis of joinder must start somewhere. There must be a first defendant and claim to permit the Court to determine whether joinder is proper. Plaintiff names Warden Huss as the first defendant, the first claim he alleges is the Eighth Amendment claim against Warden Huss, and the facts relating to his claim against Huss chronologically come first in his allegations. The Court will address the matter of joinder exactly as Plaintiff presents it, with Defendant Huss as the first defendant.

Plaintiff raises only one claim against Defendant Huss. He argues that she was deliberately indifferent to a substantial risk of serious harm to Plaintiff from the COVID-19 virus when she moved Hart and Carter into segregation rather than transferring them downstate. Although Plaintiff's claims against Carlson and James follow a somewhat similar fact pattern, they do not arise out of the same transaction or occurrence. They are remote in time, involve different state actors, different units within MBP, and different motivations. The Court concludes that the claims against Carlson and James are not transactionally related to the claim against Huss. Therefore, Defendants Carlson and James are misjoined.

Because the Court has concluded that Plaintiff has improperly joined Carlson and James to this action, the Court must determine an appropriate remedy. Under Rule 21 of the Federal Rules

of Civil Procedure, "[m]isjoinder of parties is not a ground for dismissing an action." Fed. R. Civ. P. 21. Instead, Rule 21 provides two remedial options: (1) misjoined parties may be dropped on such terms as are just; or (2) any claims against misjoined parties may be severed and proceeded with separately. *See Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 572–73 (2004) ("By now, 'it is well settled that Rule 21 invests district courts with authority to allow a dispensable nondiverse party to be dropped at any time . . . .'" (*quoting Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 832 (1989))); *DirecTV, Inc. v. Leto*, 467 F.3d 842, 845 (3d Cir. 2006); *Carney v. Treadeau*, No. 2:07-cv-83, 2008 WL 485204, at \*2 (W.D. Mich. Feb. 19, 2008); *Coal. to Defend Affirmative Action v. Regents of Univ. of Mich.*, 539 F. Supp. 2d 924, 940 (E.D. Mich. 2008); *see also Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 682 (6th Cir. 1988) ("[D]ismissal of claims against misjoined parties is appropriate."). "Because a district court's decision to remedy misjoinder by dropping and dismissing a party, rather than severing the relevant claim, may have important and potentially adverse statute-of-limitations consequences, the discretion delegated to the trial judge to dismiss under Rule 21 is restricted to what is 'just.'" *DirecTV*, 467 F.3d at 845.

At least three judicial circuits have interpreted "on such terms as are just" to mean without "gratuitous harm to the parties." *Strandlund v. Hawley*, 532 F.3d 741, 745 (8th Cir. 2008) (quoting *Elmore v. Henderson*, 227 F.3d 1009, 1012 (7th Cir. 2000)); *see also DirecTV*, 467 F.3d at 845. Such gratuitous harm exists if the dismissed parties lose the ability to prosecute an otherwise timely claim, such as where the applicable statute of limitations has lapsed, or the dismissal is with prejudice. *Strandlund*, 532 F.3d at 746; *DirecTV*, 467 F.3d at 846–47.

In this case, Plaintiff brings causes of action under 42 U.S.C. § 1983. For civil rights suits filed in Michigan under § 1983, the statute of limitations is three years. *See* Mich. Comp. Laws

9

§ 600.5805(10); *Carroll v. Wilkerson*, 782 F.2d 44 (6th Cir. 1986) (per curiam); *Stafford v. Vaughn*, No. 97-2239, 1999 WL 96990, at *1 (6th Cir. Feb. 2, 1999). The statute of limitations begins to run when the aggrieved party knows or has reason to know of the injury that is the basis of his action. *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996).

The statute of limitations, however, is subject to tolling. The Sixth Circuit has recognized that, in prisoner civil rights actions, the statute of limitations is tolled for the period during which a plaintiff's available state administrative remedies were being exhausted. *See Brown v. Morgan*, 209 F.3d 595, 596–97 (6th Cir. 2000).

> The Prison Litigation Reform Act amended 42 U.S.C. § 1997e to provide: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a) (1999) . . . . This language unambiguously requires exhaustion as a mandatory threshold requirement in prison litigation. Prisoners are therefore prevented from bringing suit in federal court for the period of time required to exhaust "such administrative remedies as are available." For this reason, the statute of limitations which applied to Brown's civil rights action was tolled for the period during which his available state remedies were being exhausted.

*Id.* at 596 (citing *Harris v. Hegmann*, 198 F.3d 153, 157–59 (5th Cir. 1999) (per curiam), and *Cooper v. Nielson*, 194 F.3d 1316, 1999 WL 719514 (9th Cir. 1999)). The Sixth Circuit noted that because it could not determine when the period of exhaustion expired, the appropriate remedy was to remand the case to the District Court to "consider and decide the period during which the statute of limitations was tolled and for such other proceedings as may be necessary." *Id.* at 597. Furthermore, "Michigan law provides for tolling of the limitations period while an earlier action was pending which was later dismissed without prejudice." *Kalasho v. City of Eastpointe*, 66 F. App'x 610, 611 (6th Cir. 2003).

Plaintiff's first allegations relate to the fall of 2020. His allegations against Carlson and James are even more recent, arising in the spring of 2021. Whether or not Plaintiff receives the

benefit of tolling during the administrative exhaustion period, *see Brown*, 209 F.3d at 596, and during the pendency of this action, *Kalasho*, 66 F. App'x at 611, Plaintiff has sufficient time in the limitations period to file a new complaint against Carlson and James; he will not suffer gratuitous harm if claims against these Defendants are dismissed.

Accordingly, the Court will exercise its discretion under Rule 21 and drop Defendants Carlson and James, dismissing Plaintiff's claims against them without prejudice to the institution of a new, separate lawsuit. *See Coughlin v. Rogers*, 130 F.3d 1348, 1350 (9th Cir. 1997) ("In such a case, the court can generally dismiss all but the first named plaintiff without prejudice to the institution of new, separate lawsuits by the dropped plaintiffs"); *Carney*, 2008 WL 485204, at *3 (same).

If Plaintiff wishes to proceed with the dismissed claims, he shall do so by filing a new civil action *on the form* provided by this Court, *see* W.D. Mich. LCivR 5.6(a), and paying the required filing fee. Plaintiff is cautioned that he must limit all future actions to Defendants and claims that are transactionally related to one another. Failure to file lawsuits on the required form or filing scattershot complaints full of misjoined claims may result in prompt dismissal upon preliminary review.

## III.    Failure to State a Claim

A complaint may be dismissed for failure to state a claim if it fails "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that

is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(ii)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994). Plaintiff contends that Defendant Huss violated his Eighth Amendment rights.

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345–46 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal

civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600–01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954.

Plaintiff contends that Defendant Huss was deliberately indifferent to the risk posed by the COVID-19 pandemic. In order for a prisoner to prevail on an Eighth Amendment deliberate indifference claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479–80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)) (applying deliberate indifference standard to medical claims); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims). The deliberate-indifference standard includes both objective and subjective components. *Farmer*, 511 U.S. at 834; *Helling*, 509 U.S. at 35–37. To satisfy the objective prong, an inmate must show "that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. Under the subjective prong, an official must "know[] of and disregard[] an excessive risk to inmate health or safety." *Id.* at 837. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

Plaintiff's claim is premised on his assertion that Defendant Huss did not do enough to protect him from COVID-19 infection. In a 2020 case brought by federal prisoners under 28 U.S.C. § 2241, the Sixth Circuit addressed the issue of whether the Bureau of Prisons (BOP) violated the

Eighth Amendment rights of medically vulnerable inmates at the Elkton Federal Correctional

Institution by failing to adequately protect them from COVID-19 infection. *Wilson*, 961 F.3d

at 829. In the opinion, the Sixth Circuit found that the plaintiffs in *Wilson* had easily satisfied the

objective component of an Eighth Amendment claim:

> The COVID-19 virus creates a substantial risk of serious harm leading to
> pneumonia, respiratory failure, or death. The BOP acknowledges that "[t]he health
> risks posed by COVID-19 are significant." CA6 R. 35, Appellant Br., PageID 42.
> The infection and fatality rates at Elkton have borne out the serious risk of COVID-
> 19, despite the BOP's efforts. The transmissibility of the COVID-19 virus in
> conjunction with Elkton's dormitory-style housing—which places inmates within
> feet of each other—and the medically-vulnerable subclass's health risks, presents a
> substantial risk that petitioners at Elkton will be infected with COVID-19 and have
> serious health effects as a result, including, and up to, death. Petitioners have put
> forth sufficient evidence that they are "incarcerated under conditions posing a
> substantial risk of serious harm." *Farmer*, 511 U.S. at 834.

*Id.* at 840.

Under that precedent, a medically vulnerable plaintiff may satisfy the objective prong by

alleging conditions that could facilitate COVID-19 transmission within a prison and the health

risks posed by the virus. Plaintiff alleges conditions that might facilitate COVID-19 transmission,

and Plaintiff states that he suffers from at least one condition that might make him medically

vulnerable: high blood pressure. At this early stage, the Court concludes that Plaintiff alleges facts

sufficient to satisfy the objective prong of the deliberate indifference test.

Notwithstanding Plaintiff's ability to satisfy the objective prong, he fails to allege facts

sufficient to satisfy the subjective prong of the deliberate indifference test. The Sixth Circuit went

on in *Wilson* to address the subjective prong of an Eighth Amendment claim, noting that the

pertinent question was whether the BOP's actions demonstrated deliberate indifference to the

serious risk of harm posed by COVID-19 in the prison:

> There is no question that the BOP was aware of and understood the potential
> risk of serious harm to inmates at Elkton through exposure to the COVID-19 virus.
> As of April 22, fifty-nine inmates and forty-six staff members tested positive for

14

COVID-19, and six inmates had died. "We may infer the existence of this
subjective state of mind from the fact that the risk of harm is obvious." *Hope v.
Pelzer*, 536 U.S. 730, 738 (2002). The BOP acknowledged the risk from COVID-
19 and implemented a six-phase plan to mitigate the risk of COVID-19 spreading
at Elkton.

The key inquiry is whether the BOP "responded reasonably to th[is] risk."
*Farmer*, 511 U.S. at 844. The BOP contends that it has acted "assiduously to protect
inmates from the risks of COVID-19, to the extent possible." CA6 R. 35, Appellant
Br., PageID 42. These actions include implement[ing] measures to screen inmates
for the virus; isolat[ing] and quarantin[ing] inmates who may have contracted the
virus; limit[ing] inmates' movement from their residential areas and otherwise
limit[ing] group gatherings; conduct[ing] testing in accordance with CDC
guidance; limit[ing] staff and visitors and subject[ing] them to enhanced screening;
clean[ing] common areas and giv[ing] inmates disinfectant to clean their cells;
provid[ing] inmates continuous access to sinks, water, and soap; educat[ing] staff
and inmates about ways to avoid contracting and transmitting the virus; and
provid[ing] masks to inmates and various other personal protective equipment to
staff. *Id.* at 42–43.

The BOP argues that these actions show it has responded reasonably to the
risk posed by COVID-19 and that the conditions at Elkton cannot be found to
violate the Eighth Amendment. We agree.

Here, while the harm imposed by COVID-19 on inmates at Elkton
"ultimately [is] not averted," the BOP has "responded reasonably to the risk" and
therefore has not been deliberately indifferent to the inmates' Eighth Amendment
rights. *Farmer*, 511 U.S. at 844. The BOP implemented a six-phase action plan to
reduce the risk of COVID-19 spread at Elkton. Before the district court granted the
preliminary injunction at issue, the BOP took preventative measures, including
screening for symptoms, educating staff and inmates about COVID-19, cancelling
visitation, quarantining new inmates, implementing regular cleaning, providing
disinfectant supplies, and providing masks. The BOP initially struggled to scale up
its testing capacity just before the district court issued the preliminary injunction,
but even there the BOP represented that it was on the cusp of expanding testing.
The BOP's efforts to expand testing demonstrate the opposite of a disregard of a
serious health risk.

*Id.* at 840–41.

In its decision, the Sixth Circuit recognized that other Sixth Circuit decisions have found

similar responses by prison officials and medical personnel, such as cleaning cells, quarantining

infected inmates, and distributing information about a disease in an effort to prevent spread, to be

reasonable. *Id.* at 841 (citing *Wooler v. Hickman Cnty.*, 377 F. App'x 502, 506 (6th Cir. 2010);

*Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 448–49 (6th Cir. 2014); *Harrison v. Ash*, 539 F.3d 510,

519–20 (6th Cir. 2008); *Rhinehart v. Scutt*, 894 F.3d 721, 740 (6th Cir. 2018)). The *Wilson* Court

also noted that other circuits had concluded that similar actions by prison officials demonstrated a

reasonable response to the risk posed by COVID-19:

> In *Swain* [*v. Junior*], the Eleventh Circuit granted a stay of a preliminary injunction pending appeal on state inmates' Eighth Amendment claims. 958 F.3d [1081,] 1085 [(11th Cir. 2020) (per curiam)]. The Eleventh Circuit held that "the inability to take a positive action likely does not constitute 'a state of mind more blameworthy than negligence,'" and "the evidence supports that [Metro West Detention Center ("MWDC") is] taking the risk of COVID-19 seriously." *Id.* at 1088–90 (citation omitted). In response to the pandemic in early March, MWDC began "cancelling inmate visitation; screening arrestees, inmates, and staff; and advising staff of use of protective equipment and sanitation practices" and, after reviewing further CDC guidance, began "daily temperature screenings of all persons entering Metro West, establish[ed] a 'COVID-19 Incident Command Center and Response Line' to track testing and identify close contacts with the virus, develop[ed] a social hygiene campaign, and mandate[d] that staff and inmates wear protective masks at all times." *Id.* at 1085–86. The Eleventh Circuit held that, because MWDC "adopted extensive safety measures such as increasing screening, providing protective equipment, adopting [physical] distancing when possible, quarantining symptomatic inmates, and enhancing cleaning procedures," MWDC's actions likely did not amount to deliberate indifference. *Id.* at 1090.
>
> Similarly, the Fifth Circuit granted stays of two preliminary injunctions in *Valentine* [*v. Collier,* 956 F.3d 797 (5th Cir. 2020) (per curiam),] and *Marlowe* [*v. LeBlanc*, No. 20-30276, 2020 WL 2043425 (5th Cir. Apr. 27, 2020) (per curiam)]. In *Valentine*, inmates at Texas's Wallace Pack Unit filed a class action suit against the Texas Department of Criminal Justice ("TDCJ") alleging violations of the Eighth Amendment. 956 F.3d at 799. In response to the COVID-19 pandemic, TDCJ had taken preventative measures such as providing "access to soap, tissues, gloves, [and] masks," implementing "regular cleaning," "quarantin[ing] of new prisoners," and ensuring "[physical] distancing during transport." *Id.* at 802. The Fifth Circuit determined that the district court applied the wrong legal standard by "collaps[ing] the objective and subjective components of the Eighth Amendment inquiry" by "treating inadequate measures as dispositive of the Defendants' mental state" under the subjective prong and held that "accounting for the protective measures TDCJ has taken" the plaintiffs had not shown deliberate indifference. *Id.* at 802–03. In *Marlow*e, the Fifth Circuit relied on its reasoning in *Valentine* and again reiterated that there was "little basis for concluding that [the correctional center's] mitigation efforts," which included "providing prisoners with disinfectant spray and two cloth masks[,] . . . limiting the number of prisoners in the infirmary lobby[,] and painting markers on walkways to promote [physical] distancing," were insufficient. 2020 WL 2043425, at \*2–3.

*Wilson*, 961 F.3d at 841–42.

After reviewing the cases, the *Wilson* Court held that even if the BOP's response to COVID-19 was inadequate, it took many affirmative actions, not only to treat and quarantine inmates who had tested positive, but also to prevent widespread transmission of COVID-19. The Court held that because the BOP had neither disregarded a known risk nor failed to take steps to address the risk, it did not act with deliberate indifference in violation of the Eighth Amendment. *Id.* at 843–44.

In addition, in *Cameron v. Bouchard*, 818 F. App'x 393 (6th Cir. 2020), the Court relied on *Wilson* to find that pretrial detainees in the Oakland County Jail were unlikely to succeed on the merits of their Eighth and Fourteenth Amendment claims. The plaintiffs in *Cameron* claimed that jail officials were deliberately indifferent to the substantial risk of harm posed by COVID-19. The district court initially granted a preliminary injunction requiring the defendants to "(1) provide all [j]ail inmates with access to certain protective measures and medical care intended to limit exposure, limit transmission, and/or treat COVID-19, and (2) provide the district court and Plaintiffs' counsel with a list of medically vulnerable inmates within three business days." *Id.* at 394. However, following the decision in *Wilson*, the Court granted the defendants' renewed emergency motion to stay the preliminary injunction, finding that the preventative measures taken by the defendants were similar to those taken by officials in *Wilson* and, thus, were a reasonable response to the threat posed by COVID-19 to the plaintiffs. *Id.* at 395. Subsequently, in an unpublished opinion issued on July 9, 2020, the Sixth Circuit vacated the injunction. *Cameron v. Bouchard*, 815 F. App'x 978 (6th Cir. 2020).

More recently, the Sixth Circuit affirmed this Court's dismissal of a claim very similar to Plaintiff's:

Dykes-Bey alleges that the defendants were deliberately indifferent to the serious risk of harm posed by COVID-19. A deliberate-indifference claim under the Eighth Amendment includes both an objective and a subjective prong: (1) the inmate "is incarcerated under conditions posing a substantial risk of serious harm," and (2) "the official knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994).

As we recognized in *Wilson v. Williams*, 961 F.3d 829, 840 (6th Cir. 2020), "the objective prong is easily satisfied" in this context. "The COVID-19 virus creates a substantial risk of serious harm leading to pneumonia, respiratory failure, or death." *Id*. "The transmissibility of the COVID-19 virus in conjunction with [a prison's] dormitory-style housing—which places inmates within feet of each other—and [an inmate's] health risks, presents a substantial risk that [an inmate] will be infected with COVID-19 and have serious health effects as a result, including, and up to, death." *Id*. The objective prong is met here.

The subjective prong, on the other hand, generally requires alleging at least that the defendant "acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id*. (quoting *Farmer*, 511 U.S. at 842). "The official must have a subjective 'state of mind more blameworthy than negligence,' akin to criminal recklessness." *Cameron v. Bouchard*, 815 F. App'x 978, 984 (6th Cir. 2020) (quoting *Farmer*, 511 U.S. at 835). As relevant here, "[t]he key inquiry is whether the [defendants] 'responded reasonably to the risk' . . . posed by COVID-19." *Wilson*, 961 F.3d at 840–41 (quoting *Farmer*, 511 U.S. at 844) (alterations added and omitted). And a response may be reasonable even if "the harm imposed by COVID-19 on inmates . . . 'ultimately [is] not averted.'" *Id*. at 841 (quoting *Farmer*, 511 U.S. at 844).

Dykes-Bey fails to satisfy the subjective prong. He alleges that the defendants, knowing of the harm posed by COVID-19, acted with deliberate indifference by not providing KCF's inmates with the necessary means to practice social distancing. But Dykes-Bey's complaint does not allege any facts indicating that the defendants were deliberately indifferent to him or any other plaintiff. The complaint does not allege, for example, that KCF had enough physical space to implement social distancing, and that the defendants deliberately chose not to use that space. *Cf. Cameron*, 815 F. App'x at 986 (concluding that the plaintiffs failed to produce evidence showing that the defendants let empty prison cells go unused). Nor does it allege that the defendants knowingly housed COVID-19-positive inmates alongside any plaintiff, or even that a COVID-19 outbreak occurred in KCF. Dykes-Bey's allegations about the lack of social distancing, therefore, do not establish deliberate indifference.

Moreover, Dykes-Bey's focus on social distancing ignores the "key inquiry" in these cases—whether the defendants "'responded reasonably to the risk' . . . posed by COVID-19." *Wilson*, 961 F.3d at 840–41 (citation omitted). To that end, Dykes-Bey's own allegations establish that the defendants acted reasonably. The complaint recognizes, for example, that the defendants screened

employees daily for COVID-19 symptoms, provided masks to inmates, required correctional officers to wear masks (although some unnamed officers allegedly did not wear them properly), and provided bleach-based disinfectant in every communal bathroom. In other words, Dykes-Bey's complaint acknowledges that the defendants took affirmative steps to mitigate COVID-19's risks. Although he argues that those steps would ultimately be insufficient to stop an outbreak, whether these steps were sufficient matters less than what they say about the defendants' states of mind. *Id*. at 841 (noting that defendants may have responded reasonably even if the "harm imposed by COVID-19 on inmates . . . 'ultimately [is] not averted'" (quoting *Farmer,* 551 U.S. at 844)). That is, what matters is whether the precautionary steps taken show that the defendants responded reasonably to the risks of COVID-19. Here, as in *Wilson,* they do. *See, e.g., id.* at 840–41 (finding that similar measures amounted to a reasonable response). In short, these allegations defeat the subjective prong and thus his deliberate indifference claim.

The district court concluded that the defendants were not deliberately indifferent, but it relied on materials outside the record—official sanitation and hygiene policies adopted by the MDOC, reports of confirmed COVID-19 cases at KCF, and an MDOC press release—to reach this conclusion. *See* R. 36, Page ID# 281. Even if its consideration of those materials was improper, we may affirm on any basis supported by the record. *See Angel v. Kentucky*, 314 F.3d 262, 264 (6th Cir. 2002). As stated, Dykes-Bey's own allegations suffice to show that the defendants did not disregard the risks of COVID-19. Therefore, we affirm the district court's judgment on those grounds.

*Dykes-Bey v. Washington*, No. 21-1260, 2021 WL 7540173, at *2–3 (6th Cir. Oct. 14, 2021) (footnote omitted). Moreover, the reasonableness of the response in Plaintiff's case is even more readily apparent because the "official sanitation and hygiene policies," as reflected in the DOM that was off-limits in *Dykes-Bey*, are properly considered here because Plaintiff specifically relies upon them in his complaint.

Plaintiff contends that Defendant Huss did not reasonably respond to the COVID-19 threat. His factual allegations to support this claim are not particularly detailed. He claims: (1) that Huss failed to transfer sick prisoners downstate, as required by MDOC Director's Office Memorandum (DOM) 2020-30R4; and (2) Huss permitted COVID-19 positive prisoners to be in the same unit as Plaintiff when the ventilation system is common to the entire unit. It is from these failings that

Plaintiff asks the Court to infer that Huss was deliberately indifferent to the substantial risk of harm from COVID-19.

Plaintiff claims that MDOC DOM 2020-30R4 required Huss to transfer Hart and Carter downstate and invites the Court to infer that her failure to do so evidences deliberate indifference. The claim fails in its premise. The MDOC publishes its DOMs. DOM 2020-30R4, effective August 10, 2020, sets out the steps Defendant Washington directed the MDOC to take in response to the COVID-19 pandemic. The DOM requires or permits, *inter alia*, the following:

- prisoners and staff to wear masks at all times unless they are eating or showering
- screening of all individuals entering a correctional facility for signs and symptoms of COVID-19
- social distancing in accordance with CDC guidelines
- isolation areas for prisoners who test positive and "close contacts"
- alcohol-based hand sanitizer for staff
- suspension of visits,
- suspension of transfers without CFA Deputy Director approval
- suspension of classes and programming
- the use of bleach for cell cleaning
- adequate soap for prisoners at all times
- suspension of health care copays for COVID-19 related care
- modification of dining hall seating

MDOC DOM 2020-30R4.[2] The DOM says nothing about transferring prisoners downstate. Moreover, Plaintiff's allegations do not suggest that Defendant Huss failed to comply with the DOM in any respect other than the failure to transfer positive prisoners downstate.

---

[2] The DOM Plaintiff attaches to his complaint is one of a stream of such memoranda. Although the directions were frequently amended, the core requirements and permissions set forth above appear in all of the DOMs for the period covered by Plaintiff's complaint.

Plaintiff's other complaint, that Hart and Carter were housed on the same unit and that the unit only had one ventilation system, does not run afoul of the DOM. Moreover, it does not support an inference that Huss was deliberately indifferent to the risk posed by the COVID-19 virus. Plaintiff acknowledges that Hart and Carter were on a different part—the back—of the unit. Plaintiff's allegations do not suggest that social distancing was not maintained.

Based on Plaintiff's allegations, the subjective element of a deliberate indifference claim is not met here. Accordingly, Plaintiff has failed to state an Eighth Amendment claim against Defendant Huss and his complaint is properly dismissed.

## Conclusion

Having reviewed Plaintiff's complaint under Rule 21, the Court concludes that Plaintiff has misjoined Defendants Carlson and James. The Court will drop as parties misjoined Defendants Carlson and James and will dismiss Plaintiff's claims against them without prejudice.

With regard to the Eighth Amendment claim against Defendant Huss that remains, the Court has conducted the review required by the Prison Litigation Reform Act, the Court determines that Plaintiff's claim is properly dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c).

The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). Although the Court concludes that Plaintiff's claims are properly dismissed, the Court does not conclude that any issue Plaintiff might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962). Accordingly, the Court does not certify that an appeal would not be taken in good faith. Should Plaintiff appeal this decision, the Court will assess the $505.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610–11, unless Plaintiff is barred from proceeding *in forma pauperis*, *e.g.*, by the "three-strikes" rule of

§ 1915(g). If he is barred, he will be required to pay the $505.00 appellate filing fee in one lump sum.

A judgment consistent with this opinion will be entered.


Dated:    September 29, 2022                            /s/ *Maarten Vermaat*
                                                       Maarten Vermaat
                                                       United States Magistrate Judge